UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LYMAN DAWSON, | ) |
| Plaintiff, | ) |
| v. | ) No. 1:18-cv-03219-JMS-TAB |
| WEXFORD CORP., PAUL TALBOT Dr., LAFLOWERS HSA, SAMANTHA MCABEE, | ) |
| Defendants. | ) |

**Order Granting in Part Defendants' Motion for Summary Judgment
and Directing Further Proceedings**

Indiana Department of Correction (IDOC) inmate Lyman Dawson brought this action pursuant to 42 U.S.C. § 1983 against Wexford of Indiana, LLC (called "Wexford Corp." in the complaint), the contract medical services provider for the IDOC, and three of its employees – Paul Talbot, M.D., Health Services Administrator Michelle LaFlower (called LaFlowers in the complaint), and Samantha McAbee, R.N. Dkt. 2. Mr. Dawson alleges that the individual defendants were deliberately indifferent to his serious medical needs, and that Wexford maintained a policy of allowing prescription medications to expire and run out of stock. All claims arise under the Eighth Amendment. The defendants seek summary judgment. For the reasons explained below, Dr. Talbot's motion for summary judgment is denied, and all other remaining defendants' motions are granted.

**I. Summary Judgment Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting Stokes v. *Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)).

Instead, the Court accepts as true the evidence presented by the non-moving party, and all reasonable inferences must be drawn in the non-movant's favor. *Whitaker v. Wis. Dep't of Health Servs.*, 849 F.3d 681, 683 (7th Cir. 2017) ("We accept as true the evidence offered by the non-moving party, and we draw all reasonable inferences in that party's favor."). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

"As the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Tr. of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (internal quotations omitted). "Such a dispute exists when there is sufficient evidence favoring the non-moving party to permit a trier of fact to make a finding in the non-moving party's favor as to any issue for which it bears the burden of proof." *Id.* (citing *Packer v. Tr. of Indiana Univ. Sch. of Med.*, 800 F.3d 843, 847 (7th Cir. 2015)). The non-moving party bears the burden of specifically identifying the relevant evidence of record, and "courts are not required to scour the record looking for factual disputes." *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015).

Finally, a plaintiff opposing summary judgment may not inject "new and drastic factual allegations," but instead must adhere to the complaint's "fundamental factual allegation[s]." *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014).

## II. Facts of the Case

The following statements of fact were evaluated pursuant to the standard set forth above. That is, these statements of fact are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to Mr. Dawson as the non-moving party. *Whitaker*, 849 F.3d at 683. As described below, these facts are supported by the record, which includes affidavits or declarations of the parties, medical records, and Mr. Dawson's sworn statement of facts. Dkts. 33 (defendants' evidence) & 38 (Mr. Dawson's declaration/response).

At all times relevant to the complaint, Mr. Dawson was an inmate at the Pendleton Correctional Facility (PCF). Wexford contracts with the State of Indiana to provide health services

3

to the inmates at PCF. Dr. Talbot, HSA LaFlowers, and Nurse McAbee are employees of Wexford and work at PCF.

Prior to entering prison, Mr. Dawson was in a shoot-out with police officers and suffered gunshot wounds to his head and other parts of his body resulting in a traumatic brain injury that left him with chronic dizziness, pain to his right foot, his arm, and other body parts. Dkt. 32, p. 2; dkt. 2, ¶¶ 9-10. Mr. Dawson's conditions have been somewhat relieved by medications. Dkt. 32, p. 2.

### A. Dr. Paul Talbot

Relevant to the time period at issue in this action, Dr. Talbot saw Mr. Dawson on April 10, 2017, at PCF for a chronic care visit. He continued (renewed) Mr. Dawson's existing prescriptions for meclizine (a medication used to treat motion sickness and vertigo/dizziness) and Tegretol (a medication used to treat neuropathic discomfort). *Id.*

On May 31, 2017, Mr. Dawson submitted a health care request to inform Dr. Talbot that his meclizine ran out every thirty days, leaving him with none until Dr. Talbot renewed it at a later time. Dkt. 38, ¶ 8. In the gap period, Mr. Dawson would not receive meclizine. Mr. Dawson repeatedly told Dr. Talbot (and has told Nurse McAbee and HSA LaFlowers) that he needed meclizine twice daily, every day, to control his vertigo. *Id.*, ¶¶ 8-9.

At his next chronic care appointment, three months later on July 13, 2017, Mr. Dawson asked Dr. Talbot to change his pain medication to Neurontin, a medication he had previously taken, in place of Tegretol. Dkt. 33-1, ¶ 7. But Dr. Talbot noted that on a prior occasion Mr. Dawson's laboratory tests failed to show detectible levels of Neurontin. Because Neurontin is a highly trafficked and abused drug in the prison system, Dr. Talbot did not believe a prescription for Mr. Dawson to receive Neurontin was appropriate. Dr. Talbot again considered Mr. Dawson's

condition stable, *see id.*, but Mr. Dawson asserts that Dr. Talbot did *not* conduct a neurological examination. If he had, Mr. Dawson asserts, the examination would have shown that Mr. Dawson had an ataxic gait[1], difficulty with balance, memory loss, bad coordination, and poor fine motor skills. Dkt. 38, ¶ 7. Mr. Dawson could have received treatment, such as physical therapy, for these issues if Dr. Talbot had conducted a full examination. *Id.* Instead, Dr. Talbot continued the meclizine and Tegretol prescriptions. *Id.* During this visit, Mr. Dawson had stressed the importance of his meclizine and told Dr. Talbot that the prescription ran out before being refilled because of the way in which Dr. Talbot wrote the renewals. *Id.*

Nurse Practitioner Wambui Murage, who is not a defendant in this action, saw Mr. Dawson for his next chronic care visit on October 5, 2017. She noted that his neuropathic pain and dizziness were controlled with current medications and ordered that they (meclizine and Tegretol) be continued. *Id.*

However, at some point, Mr. Dawson's meclizine prescription was changed to one time per day. Mr. Dawson asked to see Dr. Talbot concerning the decrease in his medication and wrote that his meclizine had been decreased to once a day. Dkt. 28, ¶ 11; dkt. 38, ¶ 12. He saw Dr. Talbot on October 9, 2017, who returned the dosage to twice daily. *Id.* But that order was cancelled on October 10, 2017, leaving Mr. Dawson with a once daily dose of meclizine. Dkt. 38, ¶ 12. The record does not indicate who was responsible for the first or second orders decreasing the meclizine.

---

[1] An ataxic gait is a failure of coordination or irregularity of muscular action of the limb segments commonly caused by cerebellar dysfunction, and is typically defined as the presence of abnormal, uncoordinated movements. https://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/ataxia/conditions/ (last visited January 4, 2020).

Because he was still not receiving the meclizine twice daily, Mr. Dawson submitted another health care request on October 20, 2017, writing that he was supposed to receive the medicine twice daily. Dkt. 38, ¶ 13 (citing to his medical records, dkt. 33-5, p. 211). The response to his health care request was only that the prescription was written recently, and "there is no problem with this management." *Id.*

On October 24, 2017, Mr. Dawson submitted yet another health care request, stating that his once a day meclizine was ineffective in controlling his dizziness, and he needed it twice daily. He asked, "Please fix this." Dkt. 38, ¶ 14 (citing dkt. 33-5, p. 210). Dr. Talbot saw Mr. Dawson for this issue on November 2, 2017. Dr. Talbot's and Mr. Dawson's version of what happened at this visit are strikingly different. Dkt. 33-1, ¶ 10; dkt. 38, ¶ 15. Dr. Talbot reported that he conducted a neurological examination, *see* dkt. 33-5, pp. 224-26, but Mr. Dawson asserts that he did not. Dkt. 38, ¶ 15. They also disagree as to when the meclizine prescription was changed.

When Mr. Dawson saw Dr. Talbot on January 8, 2018, for a chronic care visit, he wanted to discuss a fall he had taken on January 4 that Mr. Dawson asserted was due to his dizziness, which in turn had been caused by an ineffective dose of meclizine. Dkt. 38, ¶ 17. Mr. Dawson asserts that Dr. Talbot would not discuss the fall injuries with him and did not conduct an examination, an assertion that is contrary to Dr. Talbot's records and testimony. *See id*; dkt. 33-1, ¶ 13.

A few days later, on January 19, Mr. Dawson saw Dr. Talbot for the January fall and its resulting injuries. By then, Mr. Dawson's wounds were almost healed and there was no swelling or tenderness. Mr. Dawson could walk without a limp or needing assistance. Dr. Talbot gave Mr. Dawson a box of Tylenol for use with pain as needed. *Id.* But Mr. Dawson asserts that Dr.

Talbot did not perform a musculoskeletal examination and asserts that Dr. Talbot accused him of self-inflicting the injuries so that he could get medication. Dkt. 38, ¶ 19.

Mr. Dawson again saw Dr. Talbot on February 26, 2018, where he complained of right forearm pain that onset a few weeks before after he had been lifting weights. Dr. Talbot diagnosed the pain as muscle fatigue and recommended that Mr. Dawson not exercise his arm, which would allow the arm to heal. He asserts that he gave Mr. Dawson more Tylenol and told him he could buy additional pain medication through the commissary. Dkt. 33-1, ¶ 15. Mr. Dawson asserts that Dr. Talbot did not provide him any pain medication and conducted almost no examination. Dkt. 38, ¶ 21. Mr. Dawson also asserts that he informed Dr. Talbot that he did not have the resources to buy medication from the commissary and was still in pain, yet Dr. Talbot did not provide him with any pain medication. Dkt. 38, ¶ 22.

Later, Dr. Talbot came to understand that the medication Trileptal was as good for treating nerve pain as Tegretol, but had a better "therapeutic window." At Mr. Dawson's next medical visit on April 4, 2018, Dr. Talbot ordered that the Tegretol be tapered off and thereafter replaced with Trileptal. Dkt. 33-1, ¶ 16. Mr. Dawson asserts that Dr. Talbot did not discuss this issue with him, and that in any event he had not been receiving Tegretol since March 29, 2018, which was not a tapering. Dkt. 38, ¶ 25.

Approximately two weeks later, on April 16, 2018, Mr. Dawson complained to Dr. Talbot about continuing pain from his January 4 fall. Mr. Dawson also complained of continued pain in his heel from the 2012 gunshot wound. But Dr. Talbot saw no objective signs of pain and therefore continued Mr. Dawson's prescriptions for meclizine and Trileptal, but added a week of Tylenol. He again told Mr. Dawson that he could purchase additional medication from the commissary.

Dkt. 17, ¶ 17. Mr. Dawson asserts that Dr. Talbot did not conduct a medical examination other than a quick glance at his foot. Dkt. 38, ¶ 27.

Further discussion of the facts and disputed issues between Mr. Dawson and Dr. Talbot, akin to those described above, is unnecessary in light of the disposition of Dr. Talbot's motion. The Court now turns to the facts concerning the other defendants.

### B. Nurse Samantha McAbee

Defendant Nurse Samantha McAbee is employed by Wexford and works at PCF. Dkt. 31, ¶ 26. Her primary interaction with Mr. Dawson was receiving and responding to his requests for health care. *Id.*, ¶¶ 27-28. On December 26, 2017, she reviewed his request stating that he had run out of meclizine and asked that his medication orders be changed to "keep on person," or KOP. *Id.*, ¶¶ 30-31. Nurse McAbee did not have the authority to change Mr. Dawson's orders to KOP. She also noted that Mr. Dawson had an active prescription for meclizine. *Id.* She told Mr. Dawson he would need to bring up the KOP issue with Dr. Talbot at his next chronic care visit. *Id.* The next chronic care visit was on January 8, 2018, some thirteen days later. Mr. Dawson asserts that Nurse McAbee failed to understand the nature of his complaint (that he had run out of meclizine) and should have investigated. Dkt. 38, ¶ 34.

On January 5, 2018, Nurse McAbee received Mr. Dawson's health care request indicating that he believed his medical records were being falsified by the nursing staff because they "signed off" on his medications before they were actually administered to him. Dkt. 33-2, ¶ 32. Nurse McAbee studied Mr. Dawson's medication records and explained to him how the nursing staff enters medication notes. She hoped that this explanation would satisfy Mr. Dawson that his medical records were not being falsified. *Id.*

8

On January 11, 2018, Mr. Dawson sent another request for healthcare to Nurse McAbee, expressing concern that his Tegretol medicine was now ordered for the evening only, and not twice per day as it had been in the past. *Id.* He requested that it be changed back to twice per day. Checking the medical records, Nurse McAbee found that the two-dose per day order had expired and been replaced with a once daily order, so she informed Mr. Dawson that he would need to bring the issue up with his doctor during his next appointment. *Id.* Mr. Dawson's next appointment was eight days later, on January 19, 2018. *Id.*, ¶ 33. Nurse McAbee did not have the authority to change the dosage on her own. *Id.*

### C. Nurse Michelle LaFlower

During all times relevant to Mr. Dawson's complaint, Wexford employed defendant Michelle LaFlower, a nurse, as its Health Services Administrator at PCF. Dkt. 33-3, ¶¶ 1-2. HAS LaFlower does not have the authority to diagnose conditions or order treatment. *Id.*, ¶ 6. Her interactions with Mr. Dawson were that she reviewed some of his health care requests. *Id.*, ¶ 39. Mr. Dawson and HAS LaFlower never met face-to-face. *Id.*, ¶ 40.

On January 24, 2018, she received an informal letter (*not* a health care request form) from Mr. Dawson seeking a change in his medications. Reviewing his medical records, HAS LaFlower noted that Mr. Dawson had just recently seen Dr. Talbot for a chronic care visit and also that he had not yet submitted a request for health care for a medication change. She wrote back to Mr. Dawson, informing him of Dr. Talbot's current and recent medication orders and suggested that he complete a health care request to be seen by the medical staff. *Id.*, ¶ 7. Mr. Dawson asserts that HSA LaFlower should have investigated and found his prior health care requests dated January 11 and January 17, 2018, about the medications and taken further action. Dkt. 38, ¶ 39.

Mr. Dawson sent HSA LaFlower another informal request for an interview on March 29, 2018, concerning his Tegretol prescription that he was told would expire on April 4, 2018. *Id.*, ¶ 40; dkt. 32-3, ¶ 44. Several days later when HSA LaFlower reviewed Mr. Dawson's medical records, she noted that Dr. Talbot had entered an order on April 4, 2018, continuing the Tegretol for another five months. *Id.*, ¶ 45. HSA LaFlower also reviewed Mr. Dawson's April 3, 2018, complaint about an inability to see a doctor. But when HSA LaFlower reviewed Mr. Dawson's medical records, she also found that Mr. Dawson had seen Dr. Talbot the day after he wrote his complaint. *Id.*. She also saw that Mr. Dawson's Tegretol would be tapered off and replaced with Trileptal. *Id.*

On April 16, 2018, HSA LaFlower reviewed another informal "request for interview" from Mr. Dawson that said he had seen Dr. Talbot for three parts of his body experiencing pain, but the doctor only looked at his foot, gave him Tylenol, and restricted his recreation. *Id.*, ¶ 46; Dkt. 33-5, p. 186. He asked for something to "fix his issues" and complained about the restriction on his recreation. *Id.* HSA LaFlower responded to Mr. Dawson that he had received Tylenol, that he could purchase additional pain medication from the commissary, and that because of his various injuries, he should rest the injured areas rather than exercise them. *Id.*

Mr. Dawson sent a letter to HSA LaFlower in July 2018 complaining that his medical issues were not addressed during his recent annual health screening. Dkt. 32, ¶ 46. According to HSA LaFlower's review of the medical records, Mr. Dawson had been seen at sick call on June 11, 2018, he received an annual health screen on June 27, 2018, received a Tetanus booster shot on June 28, 2018, and had a chronic care evaluation on July 2, 2018. *Id.* His letter did not specifically ask for a different course of treatment, but the records HAS LaFlower reviewed informed her that Mr. Dawson was being seen often for his medical issues.

### D. Wexford

The Court gave Mr. Dawson's complaint the required liberal interpretation a *pro se* litigant receives and construed Mr. Dawson's allegation against Wexford as maintaining a policy of allowing prescriptions to expire and stocks of medication to run out, thereby saving money during the period when medications are not dispensed. Dkt. 2, ¶ 20. At his deposition on May 28, 2019, Mr. Dawson testified that he was suing Wexford because it did not take steps to ensure that his medications were properly stocked and on site, a statement consistent with the Court's screening. Dkt. 33-4, p. 34. In his response to the defendants' motion for summary judgment, Mr. Dawson acknowledges that he has no knowledge of Wexford's policies or procedures. Dkt. 38, ¶ 48.

### III. Discussion

Mr. Dawson's claims against the defendants for deliberate indifference to his serious medical needs arise, because he is a convicted offender, under the Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Prison officials have a duty to provide humane conditions of confinement, which includes adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To prevail on a deliberate indifference to serious medical needs claim, Mr. Dawson must show that (1) he suffered from an objectively serious medical condition, and (2) the defendants knew about the condition and the substantial risk of harm it posed but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison*, 746 F.3d 766, 775 (7th Cir. 2014); *see also Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (*en banc*) ("To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff

suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition.").

The defendants argue that Mr. Dawson is not suffering from a serious medical need. Dkt. 32, p. 27. At the summary judgment stage, construing the record in Mr. Dawson's favor, Mr. Dawson's conditions constitute serious medical needs. Thus, the focus is on the defendants' conduct, which is evaluated under a subjective standard. *See Sherrod v. Lingle*, 223 F.3d 605, 619 (7th Cir. 2000).

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation marks and quoted authority omitted). "If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties*, 836 F.3d at 729. But "in cases where unnecessary risk may be imperceptible to a lay person[,] a medical professional's treatment decision must be such a substantial departure from accepted medical judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* (internal quotation marks and quoted authority omitted). In other words, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation marks and quoted authority omitted).

**A. Dr. Talbot**

Again applying the summary judgment standard set forth in Section II, the Court finds that genuine issues of material fact exist on the issue of Dr. Talbot's liability. A finder of fact could conclude that Dr. Talbot was aware of Mr. Dawson's need for meclizine twice daily yet was deliberately indifferent to it by allowing the prescription to expire and having several days elapse before it was filled, and for not evaluating and treating his ataxic gait. Mr. Dawson's inability to safely walk while experiencing dizziness could, and according to Mr. Dawson, did result in injury-producing falls. A finder of fact could also conclude that Dr. Talbot was indifferent to Mr. Dawson's pain, as for example when Mr. Dawson needed treatment for the injuries he sustained in the fall on January 4, 2018, and when his neurological pain medication was allowed to expire rather than be tapered off.

Mr. Dawson and Dr. Talbot disagree as to much of what occurred during their interactions, and it will be up to the finder of fact to decide relevant questions about the treatment visits.

Dr. Talbot's motion for summary judgment is **denied**.

### B. Nurse McAbee

For Nurse McAbee to be deliberately indifferent to Mr. Dawson's serious medical needs, her actions or failure to act when she reviewed Mr. Dawson's records would have to "essentially [be] criminally reckless, that is [she] ignored a known risk." *See Huber v. Anderson*, 909 F.3d 201, 208 (7th Cir. 2018) (internal quotation omitted). Each time Nurse McAbee considered Mr. Dawson's health care requests, she knew that Mr. Dawson had been seen numerous times for his conditions and that the treatment was ongoing. She also saw that Mr. Dawson had an appointment with a doctor in the very near future, at the most two weeks away. Nurse McAbee had no authority to override a doctor's orders. And because none of the health care requests suggested the matter

was an emergency, Nurse McAbee's actions or inactions are not of a criminally reckless level that would violate the Eighth Amendment.

This is not to say that Nurse McAbee's actions and inactions were perfectly acceptable. Giving Mr. Dawson's claims a favorable construction, they might state a claim for negligence, but deliberate indifference is much more than that. *Huber*, 909 F.3d at 208 (deliberate indifference "requires more than negligence or even gross negligence"). And a prison inmate is entitled to only *adequate* medical care. *Farmer*, 511 U.S. at 832. A plaintiff cannot demand specific care and is not entitled to the best care possible. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006); *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2004); *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999).

Nurse McAbee's motion for summary judgment is **granted**.

**C. HSA LaFlower**

Essentially the same factors just discussed also apply to the claims against HSA LaFlower. When she reviewed Mr. Dawson's requests for health care, his informal complaints, and his medical records, her actions and her response to Mr. Dawson were not deliberately indifferent. She, too, saw that Mr. Dawson was frequently being seen by the doctor, and that his prescriptions were being renewed. HSA LaFlower saw that when Mr. Dawson called a mistake to the doctor's attention, the prescription error was fixed. Some of the errors and concerns had been addressed before HSA LaFlower learned of them. And finally, nothing in what she reviewed, even Mr. Dawson's request to "fix" his treatment, suggested to her an emergency or extremely urgent matter that had to be addressed immediately. HAS LaFlower similarly lacked authority to override Dr. Talbot's decisions. It was not deliberate indifference to allow Mr. Dawson's requests to be considered by Dr. Talbot in just a few days' time. No rational trier of fact could find otherwise.

HSA LaFlower's motion for summary judgment is **granted**.

### D. Wexford

Mr. Dawson concedes that he has no knowledge – *i.e.* evidence – of Wexford's policies and procedures. With no evidence to show that Wexford has an actual policy, practice, procedure, or habit of intentionally allowing stocks of medications to deplete, and prescriptions to lapse for days before being renewed, Mr. Dawson's claim has no evidentiary support.

Wexford's motion for summary judgment is **granted**.

### IV. Conclusion

The defendants' motion for summary judgment, dkt. [31], is **denied** as to Dr. Talbot, and **granted** as to all other defendants. Mr. Dawson's claims against Nurse McAbee, HSA LaFlower, and Wexford are **dismissed** with prejudice. The **clerk is directed** to terminate Nurse McAbee, HSA LaFlower, and Wexford from the docket as defendants. No partial judgment is necessary at this time.

Because this case will be resolved through settlement or trial, the Magistrate Judge is requested to hold a status conference with the parties to determine what remains to be done for trial, the potential for settlement, and conducting a settlement conference if appropriate.

**IT IS SO ORDERED**.

Date: 3/3/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Lyman Dawson
150147
Pendleton Correctional Facility
Electronic Service Participant – Court Only

Douglass R. Bitner
Katz Korin Cunningham, P.C.
dbitner@kkclegal.com

By electronic mail to:
    The Honorable Tim A. Baker, United States Magistrate Judge